FILED
APR 19 2010

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATE OF AMERICA,**                     Criminal Case No. 09-382-KI

                 Plaintiff,

                                  OPINION AND ORDER

   vs.

**DEONTA MARION,**

                 Defendant.


     Dwight C. Holton
     United States Attorney
     District of Oregon
     Gregory R. Nyhus
     Assistant United States Attorney
     1000 SW Third Avenue, Suite 600
     Portland, Oregon  97204-2902

        Attorneys for Plaintiff


Page 1 - OPINION AND ORDER

Harold DuCloux, III
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204

      Attorney for Defendant

KING, Judge:

Defendant Deonta Marion is charged with assaulting a fellow inmate at FCI Sheridan, in violation of 18 U.S.C. § 113(a)(6). Before the court are Defendant's Motion and Supplemental Motion to Suppress Evidence and Statements (#20, 29). For the reasons below, I grant the motions and suppress all statements Marion made during various interviews and administrative disciplinary proceedings at FCI Sheridan.

## FACTS

Inmate Shaw was punched in the jaw at FCI Sheridan on January 25, 2009. Although Shaw accused another person at first, he changed his story while being examined in the medical unit and accused Marion of the assault. Prison officials moved Marion to the Segregated Housing Unit ("SHU"), probably the same day.

On February 2, Lieutenant Debra Payne, special investigative supervisor at FCI Sheridan, went to the SHU to interview Marion in an office there. Marion was brought to the interview with his hands cuffed behind his back and remained in the cuffs throughout the interview. Lieutenant Payne asked Marion what happened with Shaw. Marion said that they argued and Marion struck Shaw with his fist. Lieutenant Payne gave Marion neither a *Miranda* warning nor an administrative rights warning during the interview.

Page 2 - OPINION AND ORDER

On approximately February 26, FBI Special Agent Jerry Gorman went with Lieutenant Payne to the SHU to interview Marion. Marion refused to make a statement after Agent Gorman Mirandized him.

The next day, Lieutenant Jim Keller received the incident report written by Lieutenant Payne. Lieutenant Keller went to the SHU to begin the administrative disciplinary investigation by interviewing Marion. The interview again took place in an interview room in the SHU with Marion's hands cuffed behind his back. The lieutenant read Marion his administrative rights which state that the inmate has the right to remain silent but that silence may be used to draw an adverse inference. The administrative rights allow the inmate to select a staff representative to assist him but do not allow the inmate to be represented by an attorney, even if he wishes to retain one himself. Marion acknowledged verbally that he understood his administrative rights.

Lieutenant Keller read the charge to Marion from the incident report and asked Marion if he had anything to say. Marion stated, "It's right," and was returned to his cell in the SHU.

On March 5, Hearings Officer Dan Cortez held the administrative disciplinary hearing for Marion in the SHU, again with Marion in cuffs. Hearings Officer Cortez testified that he typically confirms whether the inmate was previously given his administrative rights and reads the rights if necessary. After Marion heard the evidence against him, Marion admitted that he hit Shaw over a gambling debt after Shaw tried to hit Marion first.

Neither Lieutenant Keller nor Hearings Officer Cortez was aware that Marion had invoked his right to silence with Agent Gorman.

Lieutenant Payne described the SHU as a prison within the prison. Inmates in the SHU are in their cells 23 hours a day and are fed in their cells. They cannot walk around freely and

cannot continue any education programs they started prior to the transfer to the SHU. Inmates housed in the SHU get five hours of recreation a week in a cage and can talk to the four or five other inmates in the cage at the same time. SHU inmates can also go the law library for limited periods and can talk to other inmates in the law library. Compared to the general population, however, opportunities for inmates to talk in the SHU are substantially limited.

In the general population, the inmates can walk around without restraints during controlled move times to go to a work assignment, education, the law library, food service, the TV room, or recreation in a large yard without a cage. Inmates in the general population can converse freely at these destinations. An inmate can decide to skip a meal and go to one of the other destinations instead.

## DISCUSSION

Marion seeks to suppress all statements he made during interviews and administrative disciplinary proceedings related to Shaw's stabbing, as well as evidence obtained as a result of the statements, because the statements were involuntary and/or obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

Although Marion concedes that not all prisoners are in custody for purposes of Miranda, he claims that moving him to the SHU resulted in a sufficient change in his surroundings to make Miranda warnings a requirement prior to interrogation.

The government argues that it is common for prisoners to spend several days in the SHU pending the outcome of an investigation. Additionally, the government contends that the Bureau of Prisons did not design the practice as a punishment.

Miranda warnings are required for custodial interrogations of prisoners. Mathis v. United States, 391 U.S. 1, 4-5, 88 S. Ct. 1503 (1968). All questioning of prisoners is not custodial, however. Cervantes v. Walker, 589 F.2d 424, 427 (9th Cir. 1978) ("To interpret Mathis as Cervantes urges would, in effect, create a per se rule that any investigatory questioning inside a prison requires Miranda warnings. Such a rule could totally disrupt prison administration. Miranda certainly does not dictate such a consequence."). The "free to leave" standard in determining if a custodial interrogation took place is of little help in a prison setting because none of the prisoners may leave. Id. at 428. In considering an appropriate standard, the court reasoned:

> The concept of "restriction" is significant in the prison setting, for it implies the need for a showing that the officers have in some way acted upon the defendant so as to have "deprived (him) of his freedom of action in any significant way," Miranda v. Arizona, supra, 384 U.S. at 444, 86 S. Ct. at 1612 (footnote omitted). In the prison situation, this necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement. Thus, restriction is a relative concept, one not determined exclusively by lack of freedom to leave. Rather, we look to some act which places further limitations on the prisoner.
>
> In defining this concept we adhere to the objective, reasonable person standard and the same four factors we have employed under the "free to leave" test. See United States v. Curtis, supra, 568 F.2d at 646. Therefore, the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting. Such a situation requires Miranda warnings.

Id.

Here, Marion's transfer to the SHU clearly imposed limitations on the relative freedom of movement he enjoyed when housed in the general population. In the SHU, Marion was in his

Page 5 - OPINION AND ORDER

cell 23 hours a day, could not eat with other prisoners, could not access the same type of recreation as in the general population, could not move freely to the various destinations in the prison during the controlled move times, and could not converse with other prisoners as often or as easily as when housed in the general population. I also note that Marion was brought to all of the interviews and the disciplinary hearing in handcuffs and remained cuffed until he returned to his cell.

Thus, I conclude that all questioning of Marion when he was housed in the SHU occurred during custodial interrogations, as the phrase is interpreted by case law for a prison setting. See also Maryland v. Shatzer, __ U.S. __, 130 S. Ct. 1213 (2010) (return to general prison population qualified as a break in custody for purposes of Miranda and Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981)). The administrative rights warning is insufficient under Miranda due to the difference in the right to counsel. Miranda v. Arizona, 384 U.S. 436, 479 (1966) (before questioning a suspect in custody, officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning). Because Marion did not receive the Miranda warnings to which he was entitled, I suppress all of his statements.

///

///

Page 6 - OPINION AND ORDER

## CONCLUSION

Defendant's Motion and Supplemental Motion to Suppress Evidence and Statements (#20, 29) are granted. I suppress all statements Marion made to Lieutenant Payne, Lieutenant Keller, and Hearings Officer Cortez. I am unaware if any evidence was obtained as a result of those statements. If so, I also suppress the additional evidence. If this secondary ruling raises an issue between the parties, they should contact the court.

IT IS SO ORDERED.

Dated this _____/ 9 _____day of April, 2010.

Garr M. King
United States District Judge

Page 7 - OPINION AND ORDER